**E.R. HAWTHORNE & CO., INC., A/C Veped Traffic Controls, Inc., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 81–7–00957.**

United States Court of International Trade.

July 11, 1983.

Rode & Qualey, New York City (John S. Rode and R. Brian Burke, New York City, at trial and on brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Lit. Branch, New York City (Deborah E. Rand, Washington, D.C., at trial and on brief), for defendant.

BOE, Judge:

The merchandise involved in the above-entitled action, described on the invoices as "round tapered black steel tubes," was classified as "Illuminating articles and parts thereof" under item 653.39, TSUS, which provides:

Schedule 6, Part 3, Subpart F:

Illuminating articles and parts thereof, of base metal:

\*   \*   \*   \*   \*   \*   \*

Other:

\*   \*   \*   \*   \*   \*   \*

Other:

\*   \*   \*   \*   \*   \*   \*

Item 653.39 Other ........................17.6% ad valorem

Plaintiff challenges the liquidated classification and asserts four alternative classifications for the subject merchandise:

Schedule 6, Part 2, Subpart B:

Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel:

Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section:

Other than alloy iron or steel:

\*   \*   \*   \*   \*   \*   \*

Item 610.32   0.375 inch or more in outside diameter .....0.3¢ per pound

-or-

Schedule 6, Part 2, Subpart B:

Angles, shapes, and sections, all the foregoing, of iron or steel, hot rolled, forged, extruded, or drawn, or cold formed or cold finished, whether or not drilled, punched, or otherwise advanced; sheet piling of iron or steel:

Angles, shapes, and sections:

Hot rolled; or, cold formed and weighing over 0.29 pound per linear foot:

Not drilled, not punched, and not otherwise advanced:

Item 609.80   Other than alloy iron or steel .......0.1¢ per pound

-or-

Schedule 6, Part 3, Subpart F:

Hangars and other buildings, bridges, bridge sections, lockgates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars and posts and other structures and parts of structures, all the foregoing of base metal:

Of iron or steel:

\*   \*   \*   \*   \*   \*   \*

Columns, pillars, posts, beams, girders, and similar *structural units*:

Not in part of alloy iron or steel:

\*   \*   \*   \*   \*   \*   \*

Item 652.94   Other ........................4.3% ad valorem

-or-

Schedule 6, Part 3, Subpart G:

Articles of iron or steel, not coated or plated with precious metal:

\*   \*   \*   \*   \*   \*   \*

Other articles:

\*   \*   \*   \*   \*   \*   \*

Other:

\*   \*   \*   \*   \*   \*   \*

Item 657.25   Other ........................9% ad valorem

The subject merchandise consists of tapered steel tubes varying in length from 20 to 39 feet, a wall thickness of five millimeters (seven gauge), top diameters ranging from 3.17 inches and base diameters ranging from 7 to 11 inches. The merchandise was manufactured in France by Petitjean & Cie, a producer of various types of steel items, and imported into the United States ·in 1980 by Veped Traffic Controls, Inc.

Products of the kind and character of the subject merchandise are manufactured from coils of steel specifically purchased by Petitjean for a particular order. The steel is then uncoiled and slit into trapezoids according to measurements meeting the specifications of the pole ordered. After the edges are cut, the pieces are bent in a press to achieve a circular shape. Finally, the edges are welded together and the tube is cleaned and straightened.

Upon importation, the tubes are subjected to further processing steps, the nature and extent of which depends upon the purpose for which the tube is to be used. Veped, a manufacturer of traffic signs and signals, designs a support structure to meet the specific needs of each order, taking into account such factors as wind velocity in the area, amount of weight to be carried and the required measurements of the pole. Drawings are made of the desired finished support structures and poles are selected with the proper specifications based on such drawings.

Orders for support structures fabricated by Veped require the addition of attachments and components to the tube. A base plate is welded onto the bottom of the pole and several clamps to support a mast arm are welded at the top of the pole. More importantly, the pole itself must be further processed; the pole is cut at the top to the exact length specified in the drawing. The ends of the tube are squared. Provisions are made for a handhole ring to be made and attached to the pole so that electrical wiring may be connected to it. The pole must be painted or galvanized to prevent corrosion or rust. If necessary, a transformer base is attached. In sum, approximately one-half of the cost, and one-third of the time, is required to produce the raw tube as is necessary to manufacture a finished support structure.

Perhaps no other area of customs jurisprudence has been the subject of what might appear to be diverse decisions as we find in considering the issues involved herein. In decisions which might initially appear to be contradictory holdings, we find upon closer examination that the determinations therein have been made applicable and/or restricted only to the individual facts involved. General rules of interpretation, as enunciated by the trial as well as by the appellate courts, often become subjected to subsequent interpretations which were neither originally intended nor are presently applicable.

Thus, in determining the proper classification of the imported merchandise it is essential that the questions of law and fact, the principles of statutory construction, and the established rules pertinent to the application of such statutes relating thereto be considered in full complementary perspective.

It is well established that the classification of the imported merchandise is determined by the character thereof at the time of its importation. *The Carrington Co., United Geophysical Corp. v. United States,* 61 CCPA 77, 497 F.2d 902 (1974). Whether the imported merchandise shall be classified by its generic description, by an *eo nomine* designation or as parts of an article is dependent upon the specific TSUS provisions as well as the identity and character of the merchandise. *John V. Carr & Son, Inc. v. United States,* 72 Cust.Ct. 19 (1974). In determining the character and identity of the subject merchandise at the time of its importation the court must necessarily consider the degree of advancement which the merchandise has undergone as well as the use or uses, if any, of the merchandise. *Doherty-Barrow of Texas, Inc. v. United States,* 3 CIT ——, Slip Op. 82–47 (June 16, 1982); *United States v. The Carborundum Co.,* 63 CCPA 98, 536 F.2d 373 (1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976).

Ultimate use, alone, does not serve as the determining test for the classification of merchandise as imported. The court in *John V. Carr, supra,* at 27, has well expressed the requirement of initially determining whether such merchandise at the time of importation has been sufficiently advanced so that it can be used as a part of

an article without substantial additional processing:

It may well be that most angles, shapes and sections are *ultimately* dedicated and used as parts of articles and that such *ultimate* use determines the form in which the angles, shapes and sections are made. *See United States v. The Singer Manufacturing Company,* 37 CCPA 104, 106, 107, C.A.D. 427 (1950). But this scarcely means that all angles, shapes and sections are parts *per se.* Thus, if in its imported condition, an angle, shape or section has been processed or advanced in manufacture *only* to a point where substantial additional processing is necessary before it can be used as a part of a given article, the import would not be classifiable as a 'part,' but rather would be considered a material and thus (if meeting the other statutory requirements) classifiable under a provision for angles, shapes and sections. *See e.g., United States v. The Singer Manufacturing Company, supra,* 37 CCPA 104; *Associated Metals & Minerals Corp. v. United States, supra,* 65 Cust.Ct. 586. [Italics in original; emphasis supplied.]

In like manner, our appellate court through Chief Judge Markey has held that merchandise which has "not been sufficiently advanced in its manufacture to have reached a point where it is incapable of being made into other things" and whose "degree of processing had not changed (it), as imported, into a clearly identifiable part of any device," will not be classified as a part of that device. *Avins Industrial Products Co. v. United States,* 62 CCPA 83, 515 F.2d 782 (1975). *See* also *Terumo-America v. United States,* 2 CIT 121 (1981).

The defendant in support of the classification of the subject merchandise, as liquidated, predicates its argument principally on the alleged "chief use" of the merchandise as poles for illuminating articles. In so doing, the defendant relies on General Interpretative Rule 10(ij), TSUS, which provides:

A provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

In its application of the foregoing rule, however, the defendant fails to give appropriate consideration to the qualifying phrase included therein:

* * * but does not prevail over a specific provision for such part.

■ The foregoing concluding phrase of the interpretative rule instructs, that notwithstanding what may be the chief use of imported merchandise, such merchandise cannot be classified as a part of an article if, as imported, it is otherwise specifically provided for in the tariff schedules. *See West Coast Glass Distributors v. United States,* 62 Cust.Ct. 444, 298 F.Supp. 1188 (1969);[1] *Robert Bosch Corp., et al. v. United States,* 63 Cust.Ct. 187, 305 F.Supp. 921 (1969).

From all the evidence submitted in the instant action it is clear that numerous steps are required to transform the merchandise, as imported, into poles or supporting structures for use with illuminating articles or for any other uses to which the merchandise might be subjected. Whether, after advancement by further required processing occurring in the United States, the subject merchandise is "chiefly used" as poles or supporting structures for illuminating articles is not relevant to the issue herein, namely—the character and identity of the subject merchandise and its use *as imported.*

It is undisputed from the evidence submitted that, as imported, the subject merchandise is destined for uses other than as the supporting structure or pole for illuminating articles. Plaintiff, after importation, further fabricates the subject merchandise for sale and ultimate use as traffic signals and traffic signs. Defendant's witness, Calvin Friar, acknowledges that, although the company by whom he is employed manufactures similar poles for ulti-

---

1. Windshields, as imported, cut and bent to fit a particular automobile, were classifiable as laminated glass, shaped, and not classifiable as parts of an automobile.

mate use chiefly as supports for illuminating articles, the poles, as imported, could be used as supports for traffic signs, signals or flagpoles. The witness further acknowledges that the specifications of the imported poles (ASTM—Standard A 595—the standard for a tapered tubular steel product) is not limited solely to lighting poles. Despite his knowledge of the height, diameter and thickness of the subject merchandise as imported, he would not be able to identify the ultimate use of said merchandise in its imported condition and particularly as reflected by Plaintiff's Exhibits 12, 13, 16, 17 and 18. The significant need for the processing of the subject merchandise after importation, in order to fulfill its ultimate use, is evidenced by the testimony of the witness, Friar, who states "a pole which is designed to support a signal pole would not be interchangeable with a light pole." [2]

■ From the testimony it is clear that merchandise of the same class or kind as the imported merchandise has not been sufficiently advanced so as to have attained an identity permitting the ascertainment of its "chief use" to be a "part" of an illuminating article. It is the advancement made to the merchandise, after importation, by the addition thereto of components which are required for a specific use that causes the same to become an identifiable part of an article—whether an illuminating article, a traffic signal, a sign or a flagpole.

The defendant relies particularly on the decisions in *United States v. Servco Company*, 60 CCPA 137, 477 F.2d 579 (1973) and *John V. Carr & Son, Inc. v. United States*, *supra*. Indeed, this court does not find the reasoning in the foregoing decisions inapplicable to the facts and issues involved in the instant action. In *Servco* our appellate court specifically states that for the purposes of appeal the imported articles were *assumed* to have no other use but to be finished into drill collars and that drill collars in turn were solely used as parts of boring machines. In like manner the opinion in *John V. Carr & Son* discloses that the plaintiff therein conceded that *at the time of importation* the merchandise was used only for incorporation into railroad cars and that, in fact, the merchandise in question therein, as imported, was described by plaintiff's witness to be an integral part of a railroad car. In the instant action, on the other hand, the basic issues are (1) whether the subject merchandise has been advanced only to a point where substantial additional processing is necessary before it can be used as a part of an article and (2) whether the subject merchandise in its imported condition is specifically provided by the Tariff Schedules of the United States.

■ Articles which are described by name or by specific function under particular provisions of the tariff schedules are to be classified thereunder, even though they are parts of another article. *West Coast Glass, supra; J.E. Bernard & Co., Inc. v. United States*, 59 Cust.Ct. 31 (1967). Item 610.32, TSUS, embodies the provision for "pipes and tubes of steel," which describes by name the subject merchandise.

Moreover, it has been held that a TSUS provision which describes an article by how it is made is no less specific for classification purposes than a description by name or function. *West Coast Glass, supra.*

The tariff schedules and the tariff classification studies provide little assistance in connection with the identity of and the processing steps involved in manufacturing pipes and tubes of steel. Minimal guidance is given with respect to dimension, sizes or shapes of these products. Accordingly, reference to Brussels Nomenclature is, indeed, appropriate as an aid in the interpretation and construction of the tariff schedules and particularly with respect to the intention of Congress in providing for the relevant items. The Tariff Classification Study, Submitting Report, November 15, 1960, page 8, states:

The 'Brussels Nomenclature' and the 'Standard Industrial Classification Manual' exerted the greatest influence on the arrangement of the proposed revised schedules.

2. R. 166.

1284

Heading 73.18, section XV of the Brussels Nomenclature is substantially similar to the provision for pipes and tubes of steel provided for in the Tariff Schedules of the United States. In describing the method of manufacture employed in connection with welding tubes and pipes, the following statement is included thereunder:

(II) Welded tubes and pipes.

In all processes employed for manufacturing welded tubes and pipes, the raw material is a flat semi-product (rolls of iron or steel strip in continuous welding, or strip or sheet metal if the manufacturing process must be carried out in two separate operations, which is the case when large tubes and pipes are desired). This semi-product is formed to a tubular shape and the abutting edges are then welded.

The provisions contained under heading 73.-18 specifically include "conical tubes" as well as tubes which are *not of uniform diameter or wall thickness:*

Tubes remain classified within this heading whether they are straight or curved (including coiled tubing), and whether or not they are of uniform diameter or wall thickness (e.g., locally expanded tubes, necked or waisted tubes, conical tubes and stepped tubes).

The foregoing, indeed, is informative and helpful in ascertaining the scope embraced by the Tariff Schedules of the United States with respect to the provisions thereof for pipes and tubes of steel, intended by the Congress.

From the evidence submitted in the instant action this court concludes that the subject merchandise, as imported, is erroneously classified as parts of an illuminating article under item 653.39, TSUS, for the reason that it is specifically provided for under the provisions of item 610.32, TSUS, as claimed by the plaintiff.

In view of the foregoing determination it is deemed unnecessary to consider the alternative classifications urged by the plaintiff.

Let judgment be entered accordingly.

JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED:

That the subject merchandise of the within action is properly classifiable under item 610.32 of the Tariff Schedules of the United States dutiable at the rate of 0.3¢ per pound.

The District Director of Customs at the port of Houston, Texas, shall reliquidate the entry accordingly.